**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TRUSTEES OF THE OHIO BRICKLAYERS         CASE NO. 1:11cv651
HEALTH & WELFARE FUND, *et al.*,

         Plaintiffs,

-vs-                                     Judge Michael R. Barrett

WALTER DAVIS MARBLE AND TILE
COMPANY,

         Defendant.

## FINAL JUDGMENT & ORDER

This matter came on for a Bench Trial on October 13, 2013 and, thereafter, the parties filed their Proposed Findings of Facts and Conclusions of Law (Doc. 28; Doc. 29; Doc. 30).

On the day prior to the hearing, the parties stipulated to certain facts (Joint Stipulations of Fact and Admissibility of Exhibits, filed October 2, 2013), including that Defendant was a signatory to the Collective Bargaining Agreement ("CBA") in question. (Pl. Exh. 1, 2, 3, 4, 5; Doc. 25). The parties further agreed that the Trustee's auditor, William Hecker, provided an audit report for the Ohio Bricklayers' Pension Plan and Ohio Bricklayers' Health & Welfare Plan of Defendant Davis Marble & Tile's payroll report and payment records for the period from October 1, 2009 to March 31, 2012. (Doc. 25, Pl. Exh. 6). The parties further stipulated the admission of all exhibits. (Pl. Exh. 1 – 20).

## CONTRIBUTIONS

At trial, Plaintiffs called Willliam Hecker of Willis & Hecker, CPA as their first witness.  Mr. Hecker testified he performed an audit-analysis of the Ohio Bricklayers' Pension Plan (Pl. Exh. 14) and an audit of the Ohio Bricklayers' Health & Welfare Plan (Pl. Exh. 15).  That audit was reported on September 4, 2012.  The audit was compiled based upon information submitted by Defendant.  (Pl. Exh. 13).  Hecker considered not only the payroll records, but Defendant's 1099s, W-2s, general ledgers, and the 941 Quarterly Report of Earnings.  (Tr. p. 8-9).  In addition, Hecker compared his findings against unemployment records.  (Tr. p. 10).  The information supplied contained all of the pertinent data with respect to salary and wages that the employees were paid and the auditor's interpolation using hourly rates to determine the approximate number of hours worked in a year.  (Tr. p. 9).  This was compared to an IRS quarterly report showing gross wages per company to compare with the W-2s provided.  (Tr. p. 9). The audit period covered three and one-half years and entailed reported hours that were remitted to the Plan Administrator, payroll hours and the difference between the two.  (Tr. p. 12-13).

After this initial audit, there was a concern as to whether all employees who recorded time were covered by the CBA.  There was also a question as to the sufficiency of the records reviewed during the first audit.  (Tr. p. 10).  The Plan Administrator then provided supplemental documentation and records to Mr. Hecker.  (Tr. p. 10).  The receipt of this information resulted in a revised audit report for each of the Plans dated July 22, 2013.  (Pl. Exh. 6, 7).  The July audit report removed "reciprocity hours" (when a worker performed services in more than one Local) and also

took into account changes in the hourly rate. (Tr. p. 17). Defendant kept a weekly payroll depicting hours worked, which the auditor compared to the hours that it reported to Plaintiffs. (Tr. p. 21). In some instances employees may have been overpaid. The auditor explained over-payment issues for certain individuals had been the result of timing differences and the submission date of the payroll reports. (Tr. p. 15-16). The hourly rate for the Health & Welfare Plan is higher than for the Pension Plan. (Tr. p. 18). Monthly over-reporting and under-reporting are picked up in the subsequent month's reporting period. (Tr. p. 19). The auditor considered the hours worked in Dayton which resulted in a reduced amount. (Tr. p. 25-26). Mr. Hecker tested his work by comparing the ADP payroll records for individual employees. (Tr. p. 30). Mr. Hecker testified that, if hours were over or under reported, credit was given in the next month. (Tr. p. 15-16). The day of the week or number of Sundays in a month does not make a difference as hours are carried over into the following month. (Tr. p. 19).

In comparing the worked hours and the hours reported to Plaintiffs, the auditor found a shortage of 2,167 hours for the Pension Plan resulting in an amount of $3,853.88 in alleged delinquent contributions. (Pl. Exh. 6). In the Health & Welfare Plan the auditor found a shortage of 2,167.5 hours, resulting in $13,300.20 in alleged delinquent contributions. (Pl. Exh 7). The total for both funds was $17,154.08 for the audit period October 1, 2009 to March 31, 2012. Mr. Hecker did not calculate late fees or liquidated damages. (Tr. p. 21-22).

Defendant offered the testimony of Donald Reisenberg, a CPA, (Tr. p. 55) who set forth his findings and commented on Plaintiff's Exhibit 12, the spreadsheet of the hours. The spreadsheet was prepared based upon the audit that was performed on the

3

Defendant's fringe benefits. (Tr. p. 56). Mr. Reisenberg audited 100% of the exceptions. Mr. Reisenberg went through the payroll records to add them up by week and compared those to the total hours reported by the union and reported any differences. (Tr. p. 56). Mr. Reisenberg testified that Plaintiffs over-calculated 3,846 hours based upon a work week which ended on Sunday and which Defendant correctly reported to the Union. (Tr. p. 60) Mr. Reisenberg did not look at the W-2s, the 941's or the Quarterly Unemployment Rates. (Tr. p. 66-67). Mr. Reisenberg relied upon what Defendant reported to the Union and the original audit. (Tr. p. 68). In commenting upon Mr. Hecker's testimony relating to "smoothing out the months" for shortages and overages, he indicated that Defendant would still be penalized for an accounting shortfall in a particular month. (Tr. p. 70). He noted exceptions and arrived at a difference between the hours of 3,846. However, one exception, Dwayne Kingsley, was corrected previously. (Tr. p. 58) Mr. Reisenberg also had a discrepancy with employee Michael Connelly. Therefore, Mr. Reisenberg's conclusion was that the total number of misreported hours was 3,846.5, minus 1,633 for Dwayne Kingsley. (Tr. p. 61).

Plaintiffs cite *Brick Masons Pension Trust v. Industrial Fence and Supply, Inc.*, 839 F.2d 1333, 1338 (9th Cir. 1988) and *Combs v. King*, 764 F.2d 818, 826 (11th Cir. 1985) for the proposition that Defendant's records were inadequate, thus shifting the burden to him to disprove the amount the amount of damages sought by Plaintiffs. The records kept by Defendant (Pl. Exh. 13) were used by both parties in this case in support of their positions and there is no testimony that these records were improperly kept. Based upon the testimony of Mr. Hecker, as opposed to any testimony against it, the Court finds that Plaintiffs have met their burden and the evidence offered by

Plaintiffs as to the amount of shortage hours is more persuasive.  Therefore, the Court finds a shortage of 2,167 hours for Pension Plan resulting in $3,853.88 in delinquent contributions as contained in Plaintiffs' Exhibit 6.  The Court further finds a shortfall of 2,167.5 hours for the Health and Welfare Plan resulting in a shortfall of $13,300.20 in delinquent contributions as contained in Plaintiffs' Exhibit 7.  Therefore, the total amount of contributions owed for both funds is $17,154.08.

### PENALTIES

Plaintiffs also offered the testimony of Robert J. Voegeli who is a consultant administrator for employee benefit plans, pension plans and health plans working for Stoner & Associates as a Vice President.  (Tr. p. 32).  Stoner & Associates serves as the Fund Administrator for the Ohio Bricklayers' Fund.  Employers are obligated to make fringe benefit payments to Stoner & Associates pursuant to collective bargaining agreements, participation agreements or project agreements.  (Tr. p. 33).

As stipulated by the parties, Defendant was a signatory to the CBA for the term of September 1, 2009 to August 31, 2010.  (Exh. 1, 2).  Defendant was also signatory to successor agreements from September 1, 2010 to August 31, 2012 (Exh. 3) as well as September 1, 2012 to August 31, 2014 (Exh. 4, 5).

To determine whether any penalties are owed, the Court looks to the statute, the language of the CBAs and the Plan language.

The Employer Report and Contribution Collection Policy, Ohio Bricklayers' Health and Welfare Plan provides: "In the event legal action is necessary, the employer will be solely responsible for all costs, payment processing fees, late fees, liquidated damages,

interest and all legal fees, court costs and audit costs incurred by the Fund(s)." (Pl. Exh. 10).

For any action to recover contributions under ERISA, 29 U.S.C. §1132(g)(2) provides:

> In any action this subchapter by a fiduciary for or on behalf of the plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan:
>
> (A)  the unpaid contributions;
> (B)  interest on the unpaid contributions;
> (C)  an amount equal to the greater of;
>   (i)  interest on the unpaid contributions, or
>   (ii)  liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under federal or state law) of the amount determined by the court under federal or state law) of the amount determined by the court under subparagraph (A);
> (D)  reasonable attorneys' fees and costs of the action, to be paid by the defendant, and
> (E)  such other legal or equitable relief as the court deems appropriate.

The statute also provides that "interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under Section 6621 of Title 26."

Each of the CBAs (Pl. Exh. 1, 2, 3, 4, 5) contain nearly identical language as it relates to the Health and Welfare Fund, which is contained in Article 8 of said contracts and the Pension Fund which is contained in Article 9 of said contracts. Article 8 merely states that the employer shall make the health and welfare payments on a monthly basis. Article 9 describes not only the payment required for pension contributions but, also that the employers are bound by the Board of Trustees' action, (¶ 35), also the method of confirmation as described in ¶36, as well as the collection of fees, penalties

6

and assessments as described in ¶37. ERISA requires employers to make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities. *See* 26 U.S.C. §146 (minimum funding standards); 29 U.S.C. §1082 (same); 29 U.S.C. §1301, *et seq.* (termination insurance); 29 U.S.C. §1364 (withdrawal liability).

Some of the payments were submitted by Defendant within several days of the due date, while others were several weeks and in a few instances, a month or more late. Failure to make the contributions required by the collective bargaining agreement is a violation of 29 U.S.C. §1145. Hourly reports may or may not be sent in contemporaneously with the payment. (Tr. p. 35). However, if the payment is late, a letter is sent indicating such. (Tr. p. 37). If a payment is late there is flat 10% fee for each month in which that happens. (Tr. p. 37). However, the CBA calls for a five-day grace period and is automatically built into the due date. (Tr. p. 40). Once it is determined that a payment is late and interest is owed, it is calculated not from the end of the grace period but from the original due date. (Tr. p. 46). Defendant testified that he thought he had twenty days within which to make the required payments. (Tr. p. 100).

Mr. Voegeli calculated that the total for late fees was $13,268.16. (Pl. Exh. 11). This is a combination of $10,453.35 for Health and Welfare and $2,833.26 for Pension. While Defendant clearly obligated himself in the CBAs to be bound by the Board of Trustees' actions as it relates to the Pension Plan, there is no such agreement as to the collection of Health and Welfare benefits. Therefore, Defendant is required to pay

$2,833.26 as late fees on the Pension Plan contribution but no late fees on the Health and Welfare Plan.[1]

## COSTS

Per the Collection Policy of the Funds, the delinquent employer is required to pay the cost of the audits unless no shortage is found.  (Pl. Exh. 10).  Mr. Hecker produced a bill for the audits (Exh. 8, 9) in the total amount of $5,150.00 which was paid by the Plan.  The Court finds the amount submitted by Mr. Hecker to be reasonable for the services performed.  Therefore, Defendant is liable for $5,150.00 plus additional costs associated with the auditor's in-court testimony.  Counsel is to submit any supplemental billing.

## ATTORNEY'S FEES

Plaintiffs are the prevailing party and as such, in accordance with Exhibit 10, Defendant is responsible for Plaintiff's reasonable attorney's fees.   Counsel is to submit a fee application to the Court within thirty (30) days of entry of this Order.

---

[1] The difficulty the Court has is that the collection policy calls for liquidated damages based upon the amounts actually due and there was a justiciable controversy as to the amount in dispute and the Plaintiffs acknowledge the original calculation of September 4, 2012 to be an error as shown by the July 22, 2013 revision and the assessment of late fees is not appropriate.

**CONCLUSION**

The Court finds in favor of Plaintiffs.  Defendant is ordered to pay $25,137.34 to

Plaintiffs, which is calculated as follows:

| | |
|---|---|
| $ 3,853.88 | Shortage for the Ohio Bricklayers Pension |
| 13,300.20 | Shortage for Ohio Bricklayers Health & Welfare |
| **$17,154.08** | **Subtotal** |
| 5,150.00 | Audit fees |
| 2,833.26 | Late Fees |
| **$25,137.34** | **TOTAL** |

Defendant also owes reasonable attorney fees in an amount to be determined at

a later date by the Court.

This matter is **CLOSED**.

**IT IS SO ORDERED.**

_/s/ Michael R. Barrett_
Michael R. Barrett, Judge
United States District Court

9